IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | |
|---|---|
| TOWER PROPERTIES COMPANY, )<br>    Plaintiff, )<br> ) <br>v. ) <br> ) <br>CITY OF LAWRENCE, KANSAS, ) <br>    Defendant. ) | Case No. 2:26-cv-02023 |

## VERIFIED COMPLAINT

Plaintiff Tower Properties Company ("Tower") states as follows for its causes of action against Defendant City of Lawrence, Kansas (the "City"):

## NATURE OF THE CASE

1. This is an action for declaratory and injunctive relief from the City's unconstitutional overreach in enacting its source-of-income discrimination ordinance, Ordinance No. 9960 (the "Ordinance"). A true and correct copy of the Ordinance is attached as **Exhibit 1**.

2. The City enacted the Ordinance to improve equal access to housing and increase affordable housing availability by, among other things, prohibiting discrimination on the basis of a person's source of income. *See generally* **Exhibit 2,** a true and correct copy of an agenda item report dated December 13, 2022, from City staff to the City Commission; *see also* Ex. 1, Section 1, § 10-101. "Source of income" under the Ordinance includes money derived from any assistance, benefit, or subsidy program, and specifically includes federal Housing Choice Vouchers ("HCV"s), which are authorized by Section 8 of

1

the Housing Act of 1937 (the "Section 8" program). *See* Ex. 1, Section 2, § 10-102.32(C)(1); *see also* 24 C.F.R. §§ 982.1–982.2.

3. Underneath the laudable goal of fair and affordable housing, however, lies a more insidious truth—the Ordinance does not just require landlords to passively accept HCVs as payment for rent. Rather, to be eligible to receive such payments, a landlord must participate in and enter a written binding agreement with the federal government obligating itself to comply with all applicable Section 8 program requirements. Compliance with the Section 8 program requirements imposes substantial burdens on landlords, a fact that Congress recognized in making Section 8 participation voluntary.

4. So, the Ordinance effectively forces landlords who would otherwise choose not to participate in the Section 8 program (as is their right under federal law) into an untenable Hobson's choice—either involuntarily comply with each and every applicable Section 8 program requirement, or decline to do so and risk being prosecuted by the City for violating the Ordinance.

5. One core aspect of Section 8 program participation is that for each housing unit a landlord rents to an HCV holder, the landlord must enter into a separate Housing Assistance Payments ("HAP") contract with the local public housing agency ("PHA") administering the Section 8 program. The HAP contract must be word-for-word in the form prescribed by the U.S. Department of Housing and Urban Development ("HUD"). A true and correct copy of the HAP contract form currently in effect, HUD-52641 (4/2023), is attached as **Exhibit 3**.

6. The mandatory, non-negotiable HAP contract includes several provisions that purport to grant the PHA and/or HUD access to the landlord's premises, records, and information, without requiring that the governmental authority obtain any additional, voluntarily-provided consent from the landlord or a duly-issued warrant. The following HAP contract provisions are tantamount to a waiver of the landlord's search-and-seizure protections under the Fourth Amendment to the United States Constitution:

   a. "The PHA may inspect the contract unit and premises at such times as the PHA determines necessary, to ensure that the unit is in accordance with the HQS [housing quality standards]." Ex. 3, Part B, ¶ 3(e).
   b. "During the HAP contract term, the rent to owner may not exceed rent charged by the owner for comparable unassisted units in the premises. The owner must give the PHA any information requested by the PHA on the rents charged by the owner for other units in the premises or elsewhere." Ex. 3, Part B, ¶ 6(d).
   c. "The owner must cooperate with the PHA and HUD in conducting equal opportunity compliance reviews and complaint investigations in connection with the HAP contract." Ex. 3, Part B, ¶ 9(b).
   d. "The owner must provide any information pertinent to the HAP contract that the PHA or HUD may reasonably require." Ex. 3, Part B, ¶ 11(a).
   e. "The PHA, HUD and the Comptroller General of the United States shall have full and free access to the contract unit and the premises, and to all accounts and other records of the owner that are relevant to the HAP contract, including the right to examine or audit the records and to make copies." Ex. 3, Part B, ¶ 11(b).
   f. "The owner must grant such access to computerized or other electronic records, and to any computers, equipment or facilities containing such records, and must provide any information or assistance needed to access the records." Ex. 3, Part B, ¶ 11(c).

7. For landlords who voluntarily choose to participate in the Section 8 program, their consent to these onerous HAP contract provisions—and the attendant

3

waiver of their Fourth Amendment rights—presumably would also be voluntary, assuming such landlords understood the provisions and their otherwise unconstitutional effects.

8. But Tower, which is a landlord with rental units within City limits, does not choose to participate in the Section 8 program. It does not choose to enter into HAP contracts. It does not choose to waive its Fourth Amendment rights. And the City cannot constitutionally force it to do so.

9. To protect the rights of Tower and others similarly situated, this Court should declare the Ordinance unconstitutional and enter preliminary and permanent injunctions against its enforcement.

## PARTIES, JURISDICTION, AND VENUE

10. Tower is a Missouri corporation with its principal place of business in Overland Park, Kansas.

11. The City is an incorporated city operating under a charter authorized by the Constitution and laws of the State of Kansas and located in Douglas County, Kansas.

12. This Court has subject matter jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 42 U.S.C. § 1983.

13. Venue in this district is proper under 28 U.S.C. § 1391(b).

## THE SECTION 8 PROGRAM

14. In 1974, Congress enacted the Section 8 program "[f]or the purpose of aiding low-income families in obtaining a decent place to live and ... promoting economically mixed housing." 42 U.S.C. § 1437f(a).

15. From the outset, Congress intended that landlord participation in the Section 8 program be voluntary, as evidenced by the fact that Congress vested landlords with critical decisions, such as the selection of tenants. *See* 42 U.S.C. § 1437f(d)(1)(A) ("[T]he selection of tenants shall be the function of the owner.").

16. Beginning in the late 1980s, in the hopes of increasing landlord participation in the Section 8 program, Congress inserted two more restrictive provisions: the "take one, take all" provision, which required that any landlord who had entered into a rental agreement with at least one Section 8 tenant could not deny future applications based on an applicant's Section 8 status alone; and the "endless lease" provision, which restricted a landlord's ability to refuse to renew a Section 8 tenant's lease. *See* Pub. L. No. 100-242, 101 Stat. 1815, § 147 ("take one, take all" provision); Pub. L. No. 101-625, 104 Stat. 4079, § 225 ("endless lease" provision); H.R. Rep. 100-122(I) (discussing concerns related to lack of landlord participation in Section 8 program).

17. It soon became clear that the "take one, take all" and "endless lease" provisions had a chilling effect on landlord participation in the Section 8 program, rather than increasing participation as intended. So, in the late 1990s, Congress repealed those provisions, thereby solidifying its intent that landlord participation and continued participation in the Section 8 program remain fully voluntary.

18. The May 23, 1997, Senate Committee Report on the Public Housing Reform and Responsibility Act of 1997 demonstrates that Congress intentionally revoked its own

"take one, take all" and "endless lease" provisions in favor of a voluntary program operating like the unassisted market:

> One of the key factors to the success of the tenant-based rental assistance program is the ability to attract property owners and managers to participate in the program. Owner participation plays a significant role in providing a broad range of housing choices for assisted families. The history of Section 8 has shown, however, that private owners and managers have been reluctant to participate, in large part because of time-consuming and costly program requirements which conflict with normal market practices. ... For example, the "take one, take all" rule requires landlords who rent to one Section 8 recipient to rent to all otherwise qualified Section 8 recipients and not refuse to lease to such recipients because they receive Section 8 assistance. Further, Section 8 leases have no set terms and Section 8 landlords are required to renew leases for Section 8 tenants (the "endless lease" rule).
>
> The Committee bill reforms Section 8 to make the program operate like the unassisted market as much as possible while maintaining program goals of providing low-income families with decent and affordable housing. The Committee expects that these changes, combined with landlord outreach efforts conducted by housing agencies as part of their program administration, will greatly expand the choice and availability of housing units.
>
> The key reforms that encourage greater owner participation include providing flexibility in resident screening and selection, minimizing housing agency involvement in tenant-owner relations, eliminating the "take one, take all" and "endless lease" rules, and conforming Section 8 leases to generally accepted leasing practices. These reforms streamline and simplify the program by reducing the involvement of the Federal government and housing agencies.

S. Rep. 105-21.

19. The Section 8 program is administered by HUD in conjunction with local PHAs, in accordance with regulations promulgated by HUD. These regulations determine landlord and tenant eligibility; limit the types of properties that can participate in the

6

program; govern the role of the landlord, tenant, and PHA; require the landlord to enter into a separate HAP contract with the PHA for each unit leased; set limits on the rent that landlords can charge; provide for governmental inspection of properties and financial records; and more. *See generally* 24 C.F.R. § 982.1 *et seq.*

20. As noted above, the Section 8 program requires that for each housing unit a landlord rents to an HCV holder, the landlord must enter into a separate HAP contract with the PHA before the landlord may receive any housing assistance payments from the PHA. The HAP contract must be in the exact form required by HUD. *See* 24 C.F.R. §§ 982.162, 982.305(c), 982.451(a); *see also* Ex. 3, Instructions for use of HAP Contract – Use of this form.

21. Also as noted above, the HAP contract that landlords must sign contains several provisions that functionally require them to waive their Fourth Amendment search-and-seizure protections, including that they must "provide any information pertinent to the HAP contract that the PHA or HUD may reasonably require;" that governmental authorities "shall have full and free access to the contract unit and the premises, and to all accounts and other records of the owner that are relevant to the HAP contract;" and that they must "grant such access to computerized or other electronic records, and to any computers, equipment or facilities containing such records, and must provide any information or assistance needed to access the records." *See* Ex. 3, Part B, ¶ 11.

7

## THE ORDINANCE

22. Chapter 10, Article I of the City's Code of Ordinances (the "Code"), sets forth the civil rights protections afforded under the City's municipal laws and governs the administration and enforcement of those rights.

23. Before the Ordinance was enacted, the Code prohibited discrimination on the basis of race, sex, religion, color, national origin, age, ancestry, familial status, sexual orientation, disability, and gender identity. *See generally* **Exhibit 4**, a true and correct copy of Code §§ 10-101, 10-102, 10-110, 10-111, as in effect before their repeal by the Ordinance.

24. On February 14, 2023, the City Commission passed the Ordinance, which amended Chapter 10, Article I of the Code to include source of income as a protected trait for purposes of the City's anti-discrimination ordinances. *See generally* Ex. 1; *compare* Ex. 4.

25. The Ordinance went into effect on June 1, 2023. *See* Ex. 1, Section 7.

26. The changes under the Ordinance manifest the City's intent to mandate landlord participation in the Section 8 program.

27. First, the Ordinance defines source of income as follows:

> **SOURCE OF INCOME.**
> means any source of money paid to an individual or family or in behalf of an individual or family, including, but not limited to:
> ...
> (C) money derived from any assistance, benefit, or subsidy program.
>
> > (1) Assistance, benefit, or subsidy programs include, but are not limited to: *Any housing assistance, such as* **Housing Choice Vouchers***, Veterans Affairs Supportive Housing (VASH) Vouchers, tribal grants or vouchers, or any other form*

8

> *of housing assistance payment or credit, whether or not paid or distributed directly to a landlord or other owner of land*; public assistance; emergency rental assistance; tribal or Native American benefit programs; veterans benefits; Social Security or other retirement programs; supplemental security income; or other assistance program administered by any federal, state, or local agency or nonprofit entity.

Ex. 1, Section 2, § 10-102.32(C)(1) (initial emphasis in original; latter emphasis added).

28. Second, the Ordinance makes it expressly unlawful for any person to, among other things, refuse to rent or to otherwise make unavailable any housing or real property because of the renter's source of income. *See* Ex. 1, Section 4, § 10-111.1.

29. Third, the Ordinance makes it expressly unlawful for any person to "refuse to comply with the administrative requirements of any assistance, benefit, or subsidy program, including but not limited to housing quality inspections for Housing Choice Vouchers." *See* Ex. 1, Section 4, § 10-111.13.

30. The Code provides for a complaint and investigation procedure that may be initiated by any person who claims they have been, are being, or are about to be, discriminated against by an unlawful act or practice in violation of Chapter 10, Article I of the Code, including alleged source-of-income discrimination. The City may likewise initiate such a complaint. *See generally* **Exhibit 5,** a true and correct copy of Code § 10-108, as currently in effect.

31. If, after investigation of a discrimination complaint, the City determines there is probable cause to credit the allegations of a complaint, it will send written notice of

9

the determination of probable cause to the complainant and the respondent. *See* Ex. 5, § 10-108(i)(6). The City, the complainant, and the respondent then must attempt to resolve the complaint through conference, conciliation, and persuasion. *See id.* at § 10-108(j)(4)–(5).

33. If conciliation efforts fail, the City will serve the respondent with a copy of the complaint and a written notice of public hearing before a City administrative commission, at which the respondent must appear and answer to the charges in the complaint. *See id.* at § 10-108(k), (n).

33. If the commission finds that the respondent has engaged in, is engaging in, or is about to engage in an unlawful discriminatory act or practice, it must issue an order requiring the respondent to cease and desist from the allegedly unlawful act or practice. *See id.* at § 10-108(o)(1). The commission must further require the respondent to take affirmative corrective action, such as—in the case of housing discrimination—requiring the respondent to rent out specific housing. *See id.* at § 10-108(o)(1)(c). Finally, the commission's order may include an award of actual damages and fines of $10,000.00 up to $50,000.00. *See id.* at § 10-108(o)(2).

34. Alternatively, after the City has issued written notice of public hearing on discrimination claims raised in a complaint, but before the public hearing has commenced, either the claimant or the respondent may elect to have the claims brought by the City in a civil action in lieu of the administrative hearing. *See id.* at § 10-108(l), (v). If the court finds that an unlawful discriminatory act or practice has occurred or is about to occur, the court

10

may award actual and punitive damages, and grant any other relief it deems appropriate, including injunctive relief ordering the respondent to refrain from engaging in the allegedly unlawful act or practice or to take affirmative corrective action. *See id.* at **§ 10-108(v)(4).**

### DISCRIMINATION COMPLAINT AGAINST TOWER

35.     Tower is a real estate company that owns and/or manages commercial and residential properties in Kansas and Missouri. Tower's residential properties include Harper Square Apartments, located at 2201 Harper Street, Lawrence, Kansas, 66046, which is within City limits.

36.     On or about June 30, 2025, prospective tenant K.L. applied to rent a unit at Harper Square Apartments. Tower approved K.L.'s application, but later learned that K.L. intended to pay some or all of their rent with HCVs. After Tower informed K.L. that it did not accept HCVs as a form of payment, K.L. declined to sign a lease for the unit.

37.     On or about August 8, 2025, K.L. filed a complaint against Tower under Chapter 10, Article I, of the Code. K.L. alleged that Tower had engaged in unlawful housing discrimination by refusing to accept HCVs for rent payment.

38.     The City conducted an investigation pursuant to K.L.'s complaint. During that investigation, the City proposed that K.L. and Tower enter into a conciliation agreement. A partially redacted true and correct copy of the most recent version of the draft agreement, sent by the City to Tower on or about December 8, 2025, is attached as **Exhibit 6.**

39. The conciliation agreement proposed by the City included the following provision:

> [Tower agrees] to accept and process the applications of all persons for occupancy of any dwelling which [it] own[s] or manage[s], in a reasonable and prompt manner, without regard to, in the City of Lawrence, ... source of income. **This includes [Tower] agreeing to change its company policy to allow housing vouchers to be used as a form of payment in all rental properties within the city limits of Lawrence, Kansas.**

*See* Ex. 6, ¶ 5 (emphasis added).

40. After Tower informed the City that it would not sign the proposed conciliation agreement, the City indicated that it would proceed with submitting its final investigative report, which would include a recommended probable cause finding of a violation of the Code.

41. On or about December 18, 2025, the City sent Tower a determination of probable cause, informing Tower that

> [t]he investigative report showed probable cause that [K.L.] was denied housing on the basis of the source of [K.L.'s] income in violation of Chapter X, Article 1, Sections 10-111.1 and 10-111.4 as amended of the Code of the City of Lawrence, Kansas. [K.L.] expressed interest in rental property and intent to use housing vouchers as a form of payment. You represented that the rental property was unavailable based on [K.L.'s] source of income.

A partially redacted true and correct copy of the City's probable cause determination is attached as **Exhibit 7**.

### TOWER'S OBJECTIONS TO SECTION 8 PROGRAM PARTICIPATION

42. Tower understands that landlord participation in the Section 8 program is voluntary under federal law.

43. Tower does not participate in the Section 8 program or accept HCVs as rent payment at any of its rental properties. Tower chooses not to do so because of the burdens imposed by Section 8 requirements, including the burden imposed by complying with inspections required by HUD and local PHAs.

44. Tower understands that the Ordinance prohibits source-of-income discrimination in part by making it illegal for a landlord to decline to rent to an HCV holder because they are an HCV holder. Tower further understands that the Ordinance contains no exception for landlords who would otherwise choose not to participate in the Section 8 program.

45. Tower understands that the Ordinance prescribes penalties for landlords who are found to be in violation of its source-of-income discrimination provisions, including the possible assessment of actual and punitive damages, fines of $10,000.00 to $50,000.00, and imposition of injunctive relief such as enforced participation in the Section 8 program.

46. Tower understands that by requiring landlords to either accept HCVs for their rental units within City limits or risk being found in violation of the Ordinance and subject to its penalties, the effect of the Ordinance is to make landlord participation in the Section 8 program mandatory.

47. Tower understands that if it is compelled to participate in the Section 8 program, for each unit it rents to an HCV holder, it will be required to enter into a separate HAP contract with the PHA administering the Section 8 program. Tower further

understands that HAP contracts are mandatory, non-negotiable, and must be word-for-word in the form prescribed by HUD.

48.     Tower understands that the HAP contract form that is currently in effect contains a number of provisions that would require it to grant the PHA and/or HUD access to its premises, records, and information, without requiring that the governmental entity first obtain either its additional, voluntarily-provided consent, or a duly-issued warrant. Tower further understands that these HAP contract provisions would constitute a waiver of its rights under the Fourth Amendment to the United States Constitution to be free from unreasonable searches and seizures.

49.     Due to its concern that participation in the Section 8 program would require it to waive its Fourth Amendment rights, in addition to other burdensome Section 8 requirements, Tower intends to continue declining to participate in the Section 8 program notwithstanding the enactment of the Ordinance.

50.     Because Tower does not intend to accept HCVs, participate in the Section 8 program, sign any HAP contracts, or sign any conciliation agreements, it reasonably fears that the City will take action against it under the Ordinance, including initiating administrative or court proceedings and subjecting it to the penalties prescribed by the Ordinance.

**COUNT I — DECLARATORY JUDGMENT UNDER 28 U.S.C. §§ 2201 & 2202**

51.     Tower incorporates and realleges all previous paragraphs of this Verified Complaint as if fully restated here.

52. Tower's rights and legal relations are affected by the Ordinance, and Tower is entitled to seek this Court's determination of the validity of the Ordinance and a declaration of Tower's rights in accordance with 28 U.S.C. §§ 2201 & 2202.

53. The Ordinance is invalid on its face and as applied to Tower because, by mandating that landlords either participate in the Section 8 program or risk bearing the consequences of violating the Ordinance, it unconstitutionally coerces landlords to sign HAP contracts and thereby waive their rights against unreasonable searches and seizures, in violation of the Fourth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment.

54. The Ordinance is invalid on its face and as applied to Tower because it actually conflicts with and is preempted by federal law that makes Section 8 participation voluntary, in violation of the Supremacy Clause of Article VI of the United States Constitution.

55. An actual controversy exists between Tower and the City in that Tower intends to engage in a course of conduct—*i.e.*, to continue declining to participate in the Section 8 program—which conduct is affected with a constitutional interest but proscribed by the Ordinance, and there is a credible threat of prosecution by the City under the Ordinance.

WHEREFORE, Tower respectfully requests that the Court declare that the Ordinance is unconstitutional on its face and as applied to Tower under the Fourth and Fourteenth Amendments to the United States Constitution; declare that the Ordinance is

unconstitutional on its face and as applied to Tower under the Supremacy Clause of Article VI of the United States Constitution; declare that the Ordinance is void and unenforceable; award Tower its costs and fees as allowed by law; and grant any other relief the Court deems just and proper.

## COUNT II — CLAIM FOR RELIEF UNDER 42 U.S.C. § 1983

56. Tower incorporates and realleges all previous paragraphs of this Verified Complaint as if fully restated here.

57. Tower is a corporation and person entitled to sue under 42 U.S.C. § 1983 to vindicate its rights protected under the Fourth Amendment to the United States Constitution to be free from unreasonable searches and seizures, as applied to the states through the Fourteenth Amendment.

58. The City is a local governmental body subject to suit under 42 U.S.C. § 1983 for its official policies, practices, customs, and/or decisions that result in the deprivation of Tower's Fourth and Fourteenth Amendment rights.

59. The Ordinance is an official policy of the City, the enforcement of which poses an actual or imminent threat to Tower's Fourth and Fourteenth Amendment rights, in that Tower intends to engage in a course of conduct—*i.e.*, to continue declining to participate in the Section 8 program—which conduct is affected with a constitutional interest but proscribed by the Ordinance, and there is a credible threat of prosecution by the City under the Ordinance.

60. The Ordinance is the direct and proximate cause of the actual or imminent threat to Tower's Fourth and Fourteenth Amendment rights.

WHEREFORE, Tower respectfully requests that the Court find that the Ordinance violates Tower's Fourth and Fourteenth Amendment rights; enjoin the City from enforcing the Ordinance; award Tower its costs and fees as allowed by law, including but not limited to its attorney's fees under 42 U.S.C. § 1988; and grant any other relief the Court deems just and proper.

## COUNT III – FEDERAL PREEMPTION OF THE ORDINANCE

61. Tower incorporates and realleges all previous paragraphs of this Verified Complaint as if fully restated here.

62. The Supremacy Clause of Article VI of the United States Constitution invalidates state and local laws that interfere with, or are contrary to, the laws of Congress. Conflict preemption exists where the local law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

63. Even if the local law and the federal statute share the same ultimate goal, the local law is nonetheless preempted if it interferes with the methods by which the federal statute was designed to reach that goal.

64. Congress intended that the Section 8 program operate like the unassisted market as much as possible and that landlord participation in the program remain voluntary.

65. The Ordinance is preempted by federal law because it makes landlord participation in the Section 8 program mandatory, which stands as an obstacle to Congress's intent that Section 8 participation remain voluntary.

66. Tower is entitled to seek equitable relief to enjoin the City and its agents from enforcing the Ordinance, which is unconstitutional because it is preempted by federal law and so violates the Supremacy Clause.

WHEREFORE, Tower respectfully requests that the Court find that the Ordinance is preempted by federal law that makes landlord participation in the Section 8 program voluntary; enjoin the City from enforcing the Ordinance; award Tower its costs and fees as allowed by law; and grant any other relief the Court deems just and proper.

## COUNT IV – PRELIMINARY AND PERMANENT INJUNCTION

67. Tower incorporates and realleges all previous paragraphs of this Verified Complaint as if fully restated here.

68. As set forth above, Tower is likely to succeed on the merits of its declaratory judgment, 42 U.S.C. § 1983, and federal preemption claims against the City.

69. Tower will suffer irreparable harm to its Fourth and Fourteenth Amendment rights unless the Court enjoins enforcement of the Ordinance, in that Tower will be forced to choose between obeying an Ordinance it believes to be unconstitutional or risk prosecution for declining to obey it.

70. In order to avoid these injuries, Tower seeks a preliminary injunction immediately enjoining the City from enforcing the Ordinance, and requiring the City to

take all necessary actions to maintain the status quo pending final resolution of Tower's declaratory judgment, 42 U.S.C. § 1983, and federal preemption claims.

71. Once Tower has prevailed on its declaratory judgment, 42 U.S.C. § 1983, and federal preemption claims, Tower seeks a permanent injunction forever enjoining the City from enforcing the Ordinance.

72. The injuries that Tower will suffer outweigh whatever harm these injunctions would cause the City.

73. These injunctions will not be against the public interest.

WHEREFORE, Tower respectfully requests that the Court enter a preliminary injunction immediately enjoining the City from enforcing the Ordinance and requiring the City to take all necessary actions to maintain the status quo pending final resolution of Tower's declaratory judgment, 42 U.S.C. § 1983, and federal preemption claims; enter a permanent injunction forever enjoining the City from enforcing the Ordinance; award Tower its costs and fees as allowed by law; and grant any other relief the Court deems just and proper.

Respectfully submitted,

**LEWIS RICE LLC**

By: /s/ Ashlyn Lewis
Ashlyn Buck Lewis, Kan. #25132
Robert W. Tormohlen, Kan. #14907
1010 Walnut, Suite 500
Kansas City, Missouri 64106
Tel: (816) 421-2500
Fax: (816) 472-2500
alewis@lewisricekc.com
rwtormohlen@lewisricekc.com

*Attorneys for Plaintiff*

## VERIFICATION

I, Stanley J. Weber, hereby declare under 28 U.S.C. § 1746 that I am personally familiar with the facts and circumstances giving rise to this Verified Complaint, that I have read this Verified Complaint, and that the facts stated in this Verified Complaint are true and correct.

Signed under penalty of perjury this ___15th___ day of ___January___, 2026.

_____
Stanley J. Weber, President & CEO
Tower Properties Company